Case: 1:26-cv-03374 JURY DEMAND
Assigned To : Moss, Randolph D.
Assign. Date : 9/28/2026
Description: Pro Se Gen. Civ. (F-DECK)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DR. KARL VON BATTEN,

Plaintiff,

v.

BOLA AHMED TINUBU, individually and in his capacity as President of the Federal Republic of Nigeria;

THE FEDERAL GOVERNMENT OF THE REPUBLIC OF NIGERIA;

AMBASSADOR CHIEF FEMI FANI-KAYODE, individually and, to the extent applicable, in his official capacity as High Commissioner of the Federal Republic of Nigeria to the Republic of South Africa, the Kingdom of Lesotho, and the Kingdom of Eswatini;

DCI GROUP AZ, LLC

and

JOHN DOES 1–10,

Defendants.

Civil Action No. __________

COMPLAINT FOR DEFAMATION, DEFAMATION BY IMPLICATION, CIVIL ASSAULT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, CIVIL CONSPIRACY, AND RELATED RELIEF

Plaintiff Dr. Karl Von Batten ("Plaintiff"), proceeding pro se, brings this action against Defendants Bola Ahmed Tinubu ("President Tinubu"), the Federal Government of the Federal Republic of Nigeria ("Nigeria"), Ambassador Chief Femi Fani-Kayode ("Fani-Kayode"), DCI Group AZ, L.L.C. ("DCI"), and John Does 1–10 (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION AND NATURE OF THE ACTION

1. This action arises from an alleged campaign of intimidation, threats, reputational destruction, and interference directed at Plaintiff Dr. Karl Von Batten ("Plaintiff") in the United States while Plaintiff was engaged in advocacy concerning Nigerian President Bola Ahmed Tinubu.

2. Plaintiff's advocacy has included sustained communications with officials and staff of the Executive Branch and United States Congress concerning the disclosure and public

RECEIVED
SEP 2 8 2026
Clerk, U.S. District & Bankruptcy Courts for the District of Columbia

significance of records maintained by the Federal Bureau of Investigation ("FBI"), Drug Enforcement Administration ("DEA"), and other federal agencies relating to historical narcotics and heroin-trafficking investigations involving President Tinubu.

3. Plaintiff alleges that, as this advocacy intensified and reached officials within the Trump Administration and Congress, persons acting for, representing, supporting, or advancing the interests of President Tinubu and the Federal Government of the Federal Republic of Nigeria undertook efforts to discredit Plaintiff before the very federal officials whose attention Plaintiff was seeking.

4. Plaintiff does not bring this action because Defendants disagreed with his political positions, defended President Tinubu, criticized Plaintiff's advocacy, or sought to persuade United States officials that Plaintiff's policy positions were incorrect.

5. Rather, Plaintiff alleges that the campaign crossed from legitimate political advocacy into actionable conduct through knowingly false factual attacks upon Plaintiff's identity, educational history, professional standing, federal relationships, and criminal history and, ultimately, through alleged threats of detention, kidnapping, and physical harm.

6. Plaintiff alleges that the reputational component of this campaign repeatedly sought to portray him as fundamentally dishonest by suggesting that he fabricated his identity, deceptively used false names, fabricated educational credentials, and falsely represented his relationship with the White House.

7. Plaintiff alleges that those subjects were particularly calculated to cause injury because his professional effectiveness depends upon credibility with Members of Congress, congressional staff, Executive Branch officials, federal agencies, clients, journalists, policymakers, and other members of the Washington governmental and foreign-policy community.

8. Plaintiff further alleges that Defendant DCI Group AZ, L.L.C. ("DCI") was retained to advance the interests of the Federal Government of the Federal Republic of Nigeria within the United States. DCI is registered with the United States Department of Justice pursuant to the Foreign Agents Registration Act ("FARA"), Registration No. 6278, and its federal foreign-agent filings identify the Republic of Nigeria, through Aster Legal, as the foreign principal for whom DCI performs services.

9. Plaintiff alleges that DCI participated in or facilitated aspects of a communications and reputational strategy directed toward Plaintiff and his advocacy. Plaintiff does not allege liability merely because DCI represented Nigeria or President Tinubu. Lawful lobbying, public relations, political advocacy, and criticism are not actionable merely because they oppose Plaintiff.

10. Plaintiff seeks to hold DCI liable only for independently actionable conduct that the evidence establishes DCI knowingly developed, supplied, authorized, coordinated, disseminated, materially assisted, or agreed with others to undertake.

11. Plaintiff alleges that the campaign escalated substantially when Defendant Ambassador Chief Femi Fani-Kayode, while holding an official Nigerian diplomatic appointment, publicly directed statements toward Plaintiff that Plaintiff understood as threats of interception, detention, kidnapping, physical harm, or other coercive treatment during international travel.

12. Fani-Kayode also publicly characterized Plaintiff as a "felon and convicted criminal." Plaintiff alleges that the assertion that he is a "felon" is objectively false.

13. Plaintiff alleges that these alleged threats cannot properly be understood in isolation from the surrounding campaign to stop or impair his advocacy. Plaintiff alleges that reputational attacks sought to destroy his ability to be heard by United States officials, while the subsequent threats sought to create fear concerning the personal consequences of continuing that advocacy.

14. Plaintiff alleges, upon information and belief where appropriate, that the timing, repetition of unusually specific personal information, relationships among relevant actors, common political interests, and sequence of events support a reasonable inference warranting discovery concerning whether particular Defendants communicated, coordinated, supplied information to one another, or otherwise participated in a common course of conduct.

15. Plaintiff does not allege that shared political allegiance, representation of Nigeria, or similar criticism standing alone establishes conspiracy.

16. Plaintiff instead seeks discovery concerning actual communications, instructions, information exchanges, contractual activities, authorization, ratification, and other evidence capable of establishing or disproving coordination.

17. Plaintiff seeks to hold each Defendant responsible only for conduct legally attributable to that Defendant and according to the elements and degree of fault required by applicable law.

18. Plaintiff recognizes that Nigeria, President Tinubu, and Ambassador Fani-Kayode may assert sovereign, head-of-state, diplomatic, foreign-official, conduct-based, or other immunity defenses.

19. Plaintiff respectfully submits those questions to this Court for determination under the governing statutes, treaties, and common law based upon the capacity in which each Defendant acted and the particular conduct underlying each claim.

## II. PLAINTIFF'S UNITED STATES ADVOCACY

20. Plaintiff conducts substantial professional activities in Washington, D.C., involving government relations, public-policy advocacy, consulting, and communications with Congress, Executive Branch officials, federal departments and agencies, journalists, clients, and other members of the Washington policy community.

21. During the period relevant to this action, Plaintiff became an outspoken advocate concerning the disclosure and examination of United States federal law-enforcement records relating to President Bola Ahmed Tinubu.

22. Plaintiff's advocacy concerned records maintained by or associated with the FBI, DEA, and other federal components relating to historical narcotics investigations involving President Tinubu.

23. Plaintiff communicated concerning these matters with officials and staff within the United States Government, including Executive Branch and congressional offices.

24. Plaintiff alleges that his advocacy directly conflicted with the reputational, diplomatic, and political interests of President Tinubu and his government within the United States.

25. Plaintiff further alleges that persons associated with the Nigerian government became aware that Plaintiff's advocacy was reaching officials within the Trump Administration and Congress.

26. Plaintiff alleges that thereafter an effort developed to cause United States officials to distrust Plaintiff personally and thereby disregard the substance of his advocacy.

27. Rather than limiting their response to disputing Plaintiff's characterization of the federal records or defending President Tinubu on the merits, participants in the alleged campaign attacked Plaintiff's personal credibility.

28. Plaintiff alleges that these attacks repeatedly focused upon subjects capable of causing maximum damage to his credibility in Washington: Plaintiff's identity and lengthy legal name; his educational history and academic credentials; his professional history; his relationship with the White House; his appointment or selection in connection with the Presidential Scholars Commission; and ultimately allegations concerning criminality.

29. Plaintiff alleges that the objective was to create a narrative that Plaintiff was not merely politically opposed to President Tinubu but was himself dishonest, fraudulent, and therefore unworthy of reliance by American officials.

30. Plaintiff alleges that this distinction is central to the case. Criticism of Plaintiff's advocacy would have challenged his arguments. The conduct alleged herein instead sought to discredit Plaintiff personally so that his arguments would not be heard.

## III. REPUTATIONAL TARGETS OF THE ALLEGED CAMPAIGN

31. Plaintiff's full legal name is Karl-Marx Edward Ikemefune William George Okeke-Von Batten.

32. Because of the unusual length of his legal name, Plaintiff has used shortened forms of that name in professional, academic, governmental, business, and public contexts.

33. Plaintiff alleges that these variations are not fabricated identities and were not created for the purpose of deceiving government officials or the public.

34. Plaintiff alleges that participants in the campaign described herein nevertheless weaponized variations of his legal name to suggest that Plaintiff maintained fabricated identities, deceptively operated under aliases, or concealed his identity.

35. Plaintiff further possesses academic records and institutional documentation concerning the educational credentials and educational history he has publicly represented.

36. Plaintiff alleges that participants in the campaign similarly weaponized his educational history to portray legitimate academic credentials and educational experiences as fabricated or fraudulent.

37. Plaintiff further possesses documentation concerning his selection or appointment in connection with the Presidential Scholars Commission.

38. Plaintiff alleges that the campaign attacked this relationship by portraying Plaintiff as falsely presenting himself as a White House adviser or fabricating a White House relationship for the purpose of obtaining influence.

39. Plaintiff alleges that these accusations were particularly calculated to injure him because they were directed at the foundation of his professional credibility with the Trump Administration and Congress.

40. Plaintiff alleges that the combined message was unmistakable: federal officials were being encouraged to regard Plaintiff not simply as a political adversary of President Tinubu but as a person who allegedly lied about his own name, education, professional background, and relationship with the United States Government.

41. Plaintiff alleges that the factual premises underlying those accusations are objectively capable of verification through identity documents, academic records, institutional

confirmations, government correspondence, appointment records, testimony, and other admissible evidence.

42. Plaintiff further alleges that Defendants knew, became aware, or recklessly disregarded information contradicting material accusations that they personally published, supplied, authorized, or knowingly caused to be disseminated.

43. Plaintiff alleges that the use of these particular subjects was intended and reasonably calculated to impair Plaintiff's relationships with Executive Branch officials, congressional offices, clients, and other professional contacts and thereby weaken his ability to continue effective advocacy concerning President Tinubu.

IV. AMBASSADOR FEMI FANI-KAYODE AND THE ESCALATION TO ALLEGED THREATS

44. Defendant Ambassador Chief Femi Fani-Kayode ("Fani-Kayode") is a Nigerian political figure, former federal minister, and, during the events relevant to this Complaint, an appointed diplomatic representative of the Federal Republic of Nigeria.

45. At the time of the alleged conduct described below, Fani-Kayode therefore occupied materially different circumstances from an ordinary private political commentator.

46. On or about September 20–21, 2026, Fani-Kayode published a series of statements directed specifically toward Plaintiff.

47. Plaintiff alleges that those statements went substantially beyond political criticism, rhetorical disagreement, or defense of President Tinubu.

48. Plaintiff alleges that Fani-Kayode communicated that Plaintiff could or would be intercepted at an airport or during international travel and subjected to detention, coercive treatment, physical harm, or other adverse action.

49. Plaintiff alleges that the statements were made in a context in which Fani-Kayode knew Plaintiff was engaged in international professional activities and advocacy concerning President Tinubu.

50. Plaintiff reasonably understood the statements as communicating that continuation of his activities could expose him to physical interception or detention when traveling outside the United States.

51. Plaintiff further alleges that Fani-Kayode published statements demonstrating awareness of Plaintiff's governmental meetings or anticipated meetings and declared, in substance, that Plaintiff was "not meeting with ANYONE."

52. Plaintiff alleges that this statement, viewed together with the surrounding communications, raised serious concern that persons aligned with the Nigerian

government were obtaining or attempting to obtain information concerning Plaintiff's governmental contacts or schedule.

53. Plaintiff does not allege that this statement alone proves unlawful surveillance. Plaintiff alleges that it constitutes circumstantial evidence relevant to the source and extent of Fani-Kayode's information concerning Plaintiff's activities.

54. Fani-Kayode further publicly described Plaintiff as a "felon and convicted criminal."

55. Plaintiff alleges that he is not a felon, has never been convicted of a felony, and has never served a day of incarceration as a result of any criminal conviction. Plaintiff alleges that Fani-Kayode's characterization of Plaintiff as a "felon" is objectively and materially false.

56. Plaintiff alleges that this accusation was a statement of objectively verifiable fact rather than protected rhetorical opinion.

57. Plaintiff further alleges that the criminal accusation reinforced the broader reputational narrative that Plaintiff was dishonest, fraudulent, and unworthy of reliance by United States officials.

58. Plaintiff alleges that the combination of an objectively verifiable accusation of criminality with statements concerning airport interception, detention, and physical consequences represented a substantial escalation from reputational attack to alleged coercive intimidation.

59. Plaintiff alleges that Fani-Kayode acted intentionally or recklessly and with knowledge that his statements would reach Plaintiff and others within the United States.

60. Plaintiff further alleges that the timing and content of Fani-Kayode's statements support discovery concerning what information he possessed concerning Plaintiff, where that information originated, with whom he communicated before and after publication, and whether any Defendant authorized, encouraged, supplied, ratified, or subsequently adopted his conduct.

    A. Plaintiff is an American citizen of Nigerian descent who maintains family ties to the Federal Republic of Nigeria and had planned to visit Nigeria this year. Plaintiff's circumstances therefore make international travel to Nigeria a reasonably foreseeable possibility.

    B. Plaintiff's understanding of Defendant Fani-Kayode's threat occurred against an extensively documented history, spanning approximately four decades, of grave abuses involving Nigerian governmental and security authorities. United States Department of State reports and reporting by international governmental and human-rights bodies have documented instances of arbitrary arrest and detention without trial; prolonged and incommunicado detention; torture and other cruel,

inhuman, or degrading treatment; excessive and unlawful force; extrajudicial, arbitrary, or unlawful killings; and forced or enforced disappearances involving Nigerian governmental or security personnel. These are not hypothetical forms of governmental abuse. They are forms of conduct that have been documented as having occurred in Nigeria under successive governments and security institutions.

C. This documented history is directly relevant to the context in which Plaintiff received and understood the words of an incumbent Nigerian diplomatic representative. The historical record demonstrates that arbitrary detention, torture, extrajudicial killing, disappearance, and other serious abuses by governmental or security personnel have occurred in Nigeria. Plaintiff therefore alleges that a threat from an official representative of that government concerning Plaintiff's interception at an airport, a "befitting welcome," the end of Plaintiff's time to "glorify" himself, and a "very long holiday" carried a materially different and substantially more serious meaning than identical words spoken by an ordinary private citizen with no governmental position or authority.

D. Against this documented historical background, Plaintiff understood Defendant Fani-Kayode's statement that he would personally meet Plaintiff "at the airport," provide him a "befitting welcome," and subject him to a "very long holiday," together with his warning that Plaintiff's time would "soon be over" and his declaration "Can't wait!", as a serious threat that Plaintiff could be forcibly seized, kidnapped, detained for a prolonged period without due process, physically harmed, or otherwise subjected to coercive treatment. Plaintiff alleges that his resulting fear was not based upon abstract speculation or ordinary sensitivity to political rhetoric, but upon the words actually directed at him by an incumbent representative of the Nigerian government, considered against the documented historical record of serious abuses involving Nigerian governmental and security authorities. Plaintiff alleges that these circumstances caused him reasonably to take the threat seriously and contributed directly to severe emotional distress, fear for his physical safety and liberty, anxiety concerning international travel, and the need for additional security precautions.

## V. DCI GROUP AZ, L.L.C. AND THE SECURE NIGERIA CAMPAIGN

61. Defendant DCI Group AZ, L.L.C. ("DCI") is a United States public-affairs and government-relations firm maintaining an office at 2000 K Street NW, Suite 900, Washington, D.C. 20006.

62. DCI is registered with the United States Department of Justice pursuant to the Foreign Agents Registration Act ("FARA"), Registration No. 6278.

63. DCI's federal foreign-agent filings identify the Republic of Nigeria, through Aster Legal, as a foreign principal for whom DCI performs services.

64. DCI's relationship to the Secure Nigeria communications operation and the X account @SecureNigeriaHQ is not alleged merely upon information and belief.

65. In federal FARA disclosures, DCI identified Secure Nigeria and @SecureNigeriaHQ as media utilized in connection with its representation of the Republic of Nigeria through Aster Legal.

66. Secure Nigeria likewise publicly identifies its materials as being distributed by DCI on behalf of the Republic of Nigeria through Aster Legal.

67. Plaintiff does not allege that DCI's representation of Nigeria, its registration under FARA, its public-relations activities, or its criticism of Plaintiff is itself unlawful.

68. Plaintiff instead challenges particular allegedly false factual accusations and other allegedly tortious conduct disseminated through @SecureNigeriaHQ and attributable to DCI.

69. Beginning no later than September 16, 2026, @SecureNigeriaHQ repeatedly targeted Plaintiff directly through his X account, @batten_von.

70. On September 16, 2026, at approximately 11:42 a.m., @SecureNigeriaHQ addressed Plaintiff as "Ikemefuna Okeke (@batten_von)" while attacking Plaintiff's professional activities.

71. Approximately thirteen minutes later, at 11:55 a.m., @SecureNigeriaHQ again addressed Plaintiff as "Ikemefuna Okeke (@batten_von)."

72. The repeated use of "Ikemefuna Okeke" is material because Plaintiff's full legal name is Karl-Marx Edward Ikemefune William George Okeke-Von Batten, and Plaintiff alleges that shortened variations of his lengthy legal name were subsequently weaponized to create the false impression that Plaintiff had changed, fabricated, or concealed his identity.

73. The identity attack became substantially more explicit on September 21, 2026.

74. On September 21, 2026, at approximately 11:22 a.m., @SecureNigeriaHQ again addressed Plaintiff as "Ikemefuna Okeke (@batten_von)" and stated: "if you changed your name to bury a checkered past, what else are you hiding?"

75. Plaintiff alleges that this statement conveyed or reinforced a materially false factual implication: that Plaintiff changed his identity or name for the deceptive purpose of concealing discreditable facts concerning his past.

76. Plaintiff alleges that the name variations referenced by Secure Nigeria arise from Plaintiff's lengthy legal name and are not fabricated identities created to conceal a "checkered past."

77. Secure Nigeria continued directing publications toward Plaintiff over the following days, repeatedly addressing him by the same name variation while attacking his credibility and advocacy concerning President Tinubu.

78. The campaign culminated in a particularly significant publication on September 24, 2026, at approximately 4:28 p.m.

79. In that publication, @SecureNigeriaHQ directly addressed Plaintiff's client, former Nigerian Vice President Atiku Abubakar, asking: "Why are you still paying this guy?"

80. Secure Nigeria then presented a list of accusations intended to explain why Plaintiff's client supposedly should question Plaintiff's continued retention.

81. Plaintiff does not assert causes of action in this Complaint based upon every statement contained in that publication.

82. Rather, Plaintiff challenges, among other actionable statements and implications, Secure Nigeria's assertion that Plaintiff was: "Falsely presenting himself as a White House adviser to gain influence" and its assertion that Plaintiff was: "Unable to answer basic questions about his education, employment history—or even his name."

83. Plaintiff alleges that these statements did considerably more than express disagreement with Plaintiff's political advocacy.

84. The statements attacked Plaintiff's honesty and professional legitimacy and conveyed that Plaintiff had fabricated or deceptively misrepresented his relationship with the White House, his identity, his educational history, and other fundamental aspects of his professional biography.

85. Plaintiff possesses documentation concerning his appointment or selection in connection with the Presidential Scholars Commission and alleges that his representations concerning that appointment were not fabricated.

86. Plaintiff likewise possesses identity and educational documentation capable of objectively establishing the material facts concerning his name and academic history.

87. Plaintiff alleges that the September 24 publication was directed not merely toward the general public but expressly toward Plaintiff's client, asking why the client continued paying Plaintiff.

88. Plaintiff alleges that the publication therefore was reasonably capable of damaging Plaintiff's existing professional and contractual relationship and was calculated to cause the client to question Plaintiff's honesty, qualifications, and continued retention.

89. Plaintiff further alleges that the September 24 publication must be considered together with Secure Nigeria's preceding publications repeatedly focusing upon Plaintiff's name, identity, professional activities, and credibility.

90. Plaintiff alleges that this sequence demonstrates a sustained communications campaign rather than an isolated response to a single statement by Plaintiff.

91. Plaintiff further alleges that these communications occurred while DCI was formally representing the Republic of Nigeria through Aster Legal and while Plaintiff was actively advocating before United States officials concerning federal law-enforcement records relating to President Tinubu.

92. Plaintiff alleges that DCI and Secure Nigeria had an obvious political and professional interest in responding to criticism of their foreign principal. Plaintiff does not contend that such an interest is independently wrongful.

93. Rather, Plaintiff alleges that DCI crossed the boundary between lawful advocacy and actionable conduct when communications attributable to it allegedly disseminated materially false factual accusations or defamatory implications concerning Plaintiff for the purpose of destroying his credibility with his client, United States officials, and other professional contacts.

94. Plaintiff seeks discovery concerning the preparation, approval, research, drafting, publication, and dissemination of the September 16, September 21, and September 24 publications.

95. Plaintiff further seeks discovery identifying the persons who selected the name "Ikemefuna Okeke," the source of information concerning Plaintiff's identity and personal history, the basis for asserting that Plaintiff changed his name to conceal a "checkered past," and the factual basis upon which Secure Nigeria accused Plaintiff of falsely presenting himself as a White House adviser.

96. Plaintiff further seeks communications between DCI, Aster Legal, Nigerian governmental officials, representatives of President Tinubu, Ambassador Femi Fani-Kayode, Secure Nigeria personnel, and other relevant persons concerning Plaintiff, his identity, education, White House appointment, client relationships, governmental advocacy, and professional activities.

97. Plaintiff does not allege that referring to him by a different portion or variation of his legal name is independently defamatory.

98. The actionable implication arises from Secure Nigeria's express assertion that Plaintiff "changed [his] name to bury a checkered past" and its accompanying question, "what else are you hiding?"

99. In context, the publication conveyed that Plaintiff had deliberately manipulated or changed his identity to conceal discreditable facts and deceive persons evaluating his professional credibility.

100. Plaintiff alleges that implication is materially false.

101. Plaintiff's use of different shortened forms of his name arises from his lengthy legal name and does not constitute an effort to manufacture a false identity or conceal a discreditable past.

102. Plaintiff alleges the statement was particularly damaging because Secure Nigeria subsequently used Plaintiff's name as one component of a broader accusation that Plaintiff could not answer basic questions about "his education, employment history—or even his name."

103. Plaintiff alleges that the September 21 and September 24 publications, read together, communicated a factual narrative that Plaintiff's identity was deceptive or fabricated.

104. Plaintiff alleges that the truth or falsity of that narrative is capable of objective determination through government identification records, historical records, educational records, professional records, and other admissible evidence.

## IX. ESCALATION FROM REPUTATIONAL ATTACKS TO ALLEGED THREATS

105. By September 2026, Plaintiff had become the subject of repeated public attacks concerning his advocacy against the interests of President Tinubu and the Nigerian government.

106. Those attacks included communications disseminated through @SecureNigeriaHQ, an account disclosed by DCI Group AZ, L.L.C. to the United States Department of Justice in connection with DCI's representation of the Republic of Nigeria through Aster Legal.

107. On September 16, 2026, @SecureNigeriaHQ repeatedly addressed Plaintiff as "Ikemefuna Okeke," using a portion and variation of Plaintiff's lengthy legal name while attacking Plaintiff and his professional activities.

108. On September 21, 2026, @SecureNigeriaHQ escalated the identity attack by asserting, in substance, that Plaintiff had changed his name to "bury a checkered past" and asking Plaintiff "what else are you hiding?"

109. Plaintiff alleges that the accusation conveyed that he deliberately manipulated or changed his identity for the purpose of concealing discreditable information.

110. Plaintiff alleges that this factual implication is false.

111. During substantially the same period, Defendant Ambassador Chief Femi Fani-Kayode was publicly directing attacks toward Plaintiff concerning Plaintiff's identity, criminal history, governmental activities, and advocacy.

112. Fani-Kayode's use of Plaintiff's name and identity is significant because Plaintiff alleges that Fani-Kayode used unusually specific name variations including "Ikemefuna" and "Karl Marx Okeke."

113. Plaintiff does not allege that two speakers' use of similar names, standing alone, proves coordination.

114. Plaintiff alleges, however, that the recurrence of unusual name variations within communications issued by persons or entities advancing substantially the same Nigerian governmental interests is circumstantial evidence relevant to the source and transmission of information concerning Plaintiff.

115. The conduct attributed to Fani-Kayode escalated substantially beyond reputational criticism.

116. On or about September 20–21, 2026, Fani-Kayode published statements directed specifically toward Plaintiff concerning what would happen to Plaintiff during future international travel.

117. Fani-Kayode stated directly to Plaintiff: "Keep twerking Ikemefuna. The time to glorify yourself will soon be over. One day you will come home and be rest assured that when you do I will meet you at the airport and give you a befitting welcome for what will be a very long holiday. Can't wait!"

118. Plaintiff alleges that, viewed in context, the promised airport interception, "befitting welcome," "very long holiday," statement that Plaintiff's time would "soon be over," and declaration "Can't wait!" communicated a threat that Plaintiff would be forcibly seized or kidnapped, held against his will for an extended period, and subjected to physical harm or coercive treatment. Plaintiff alleges that this was a threat, not an invitation, joke, or ordinary expression of political disagreement.

119. Plaintiff alleges that, considered in their complete context, Fani-Kayode's statements communicated a threat that Plaintiff could be intercepted at an airport, detained, kidnapped, physically harmed, imprisoned, or otherwise subjected to coercive action outside the United States.

120. Plaintiff alleges that these statements were directed at him personally, were made intentionally, and were reasonably understood as warning Plaintiff of physical consequences if he continued activities adverse to President Tinubu and the Nigerian government.

121. The alleged threat carried additional significance because Fani-Kayode was not merely a private internet commentator. At the time, he held an official diplomatic appointment on behalf of the Federal Republic of Nigeria.

122. Plaintiff alleges that Fani-Kayode knew or reasonably should have known that statements by an incumbent Nigerian diplomatic representative concerning Plaintiff's potential interception, detention, or physical treatment during international travel would carry materially different weight from identical words uttered by an anonymous private citizen.

123. Plaintiff alleges that he reasonably took the statements seriously because his professional activities involve international affairs and international travel.

124. Plaintiff further alleges that the statements were intended to cause him to fear the consequences of continuing his advocacy and thereby discourage, restrict, or terminate his activities concerning President Tinubu.

125. Plaintiff alleges that Fani-Kayode also demonstrated apparent knowledge concerning Plaintiff's governmental contacts or anticipated governmental meetings and declared, in substance, "You are not meeting with ANYONE!"

126. Plaintiff does not allege that this statement, standing alone, establishes unlawful surveillance or access to confidential governmental information.

127. Plaintiff alleges that the statement is relevant circumstantial evidence because it raises questions concerning what information Fani-Kayode possessed regarding Plaintiff's Washington activities, where he obtained that information, and whether information concerning Plaintiff was being exchanged among persons acting to advance Nigerian governmental interests.

128. Plaintiff seeks discovery concerning Fani-Kayode's communications regarding Plaintiff before, during, and after September 20–21, 2026, including communications with President Tinubu or his representatives, Nigerian governmental officials, diplomatic personnel, DCI, Aster Legal, persons associated with Secure Nigeria, and other relevant actors.

A. Fani-Kayode's subsequent public statements further demonstrated that his references to Plaintiff's future presence in Nigeria were accompanied by an expressed intention to invoke Nigerian governmental authority against Plaintiff. On or about September 22, 2026, after Plaintiff publicly identified Fani-Kayode's airport statement as a threat of kidnapping and physical harm, Fani-

Kayode published a response expressly stating that he intended "to report [Plaintiff] to the relevant security agencies in our country" for what he characterized as Plaintiff's "continued infractions." In the same response, Fani-Kayode invoked alleged violations of Nigeria's Cybercrime Act and expressly referenced Nigeria's courts, justice system, and "institutions of state."

B. On or about September 24, 2026, Fani-Kayode further escalated his invocation of Nigerian governmental authority by publicly stating that he intended to seek Plaintiff's extradition from the United States to Nigeria to answer for alleged violations of Nigerian cybercrime and criminal-defamation laws. Plaintiff alleges that this statement is material because Defendant expressly contemplated using governmental legal processes to cause Plaintiff, an American citizen engaged in advocacy within the United States, to be physically transferred from the United States to Nigeria and subjected to Nigerian governmental authority.

C. Plaintiff alleges that Fani-Kayode's subsequent express invocation of Nigerian security agencies, Nigerian criminal law, extradition, and the institutions of the Nigerian state is material to the meaning, intent, credibility, and coercive character of his earlier statements. Considered together, Defendant's promise personally to meet Plaintiff "at the airport," provide him a "befitting welcome," and subject him to a "very long holiday," followed by his express intention to report Plaintiff to Nigerian security agencies and seek Plaintiff's extradition to Nigeria, reinforced Plaintiff's understanding that Defendant was invoking governmental and state-backed mechanisms capable of affecting Plaintiff's physical liberty rather than engaging merely in political rhetoric or internet hyperbole.

## X. FALSE ACCUSATION THAT PLAINTIFF IS A "FELON AND CONVICTED CRIMINAL"

129. During the same course of conduct, Ambassador Fani-Kayode publicly characterized Plaintiff as a "felon and convicted criminal."

130. The statement was communicated as an assertion of fact.

131. Whether Plaintiff has been convicted of a felony is objectively verifiable through official criminal-history and court records.

132. Plaintiff alleges that he is not a felon and has never been convicted of a felony. Plaintiff alleges that Fani-Kayode's characterization of Plaintiff as a "felon" materially and falsely represented Plaintiff as having sustained a felony conviction.

133. Plaintiff therefore alleges that the "felon" component of Fani-Kayode's statement was materially false and conveyed an objectively false representation concerning the nature and legal classification of Plaintiff's criminal history.

134. An accusation of felony conviction carries an obvious capacity to injure Plaintiff's reputation and professional standing, particularly because Plaintiff's work requires interaction with government officials, Members and staff of Congress, federal agencies, clients, foreign representatives, journalists, and policymakers.

135. Plaintiff further alleges that the accusation was published during an ongoing controversy in which other attacks were portraying Plaintiff as deceptive concerning his identity, education, professional history, and governmental relationships.

136. Plaintiff alleges that the criminal accusation therefore reinforced an existing narrative that Plaintiff was dishonest, fraudulent, and unworthy of reliance.

137. Plaintiff alleges that Fani-Kayode knew the statement was false or published it while subjectively entertaining serious doubts concerning its truth.

138. Alternatively, Plaintiff alleges facts supporting an inference of reckless disregard because the existence or absence of a felony conviction was capable of verification through readily identifiable official sources before publication.

139. Plaintiff seeks discovery concerning the source from whom Fani-Kayode obtained the accusation, any records reviewed before publication, communications concerning Plaintiff's purported criminal history, and whether any person supplied the accusation to Fani-Kayode.

140. Plaintiff further seeks discovery concerning whether the accusation originated from, was discussed with, or was subsequently transmitted to any other Defendant or participant in the alleged campaign.

## XI. CONTINUING SECURE NIGERIA PUBLICATIONS FOLLOWING THE ALLEGED THREATS

141. The attacks upon Plaintiff did not end following Fani-Kayode's alleged threats.

142. On September 24, 2026, approximately three days after the events described above, @SecureNigeriaHQ published another direct attack upon Plaintiff.

143. The publication expressly addressed Plaintiff's client, former Nigerian Vice President Atiku Abubakar, and asked: "Why are you still paying this guy?"

144. The publication then presented a list of accusations concerning Plaintiff intended to call into question Plaintiff's honesty, professional legitimacy, and continued retention.

145. Plaintiff expressly excludes from the defamation claims asserted herein statements concerning domestic violence, allegations concerning a veterans' charity, and the characterization that Plaintiff made "outrageous, baseless allegations against President Tinubu."

146. Plaintiff instead challenges the materially factual assertions and implications concerning his identity, education, and White House relationship.

147. Among those accusations, Secure Nigeria asserted that Plaintiff was: "Falsely presenting himself as a White House adviser to gain influence."

148. Secure Nigeria further asserted that Plaintiff was: "Unable to answer basic questions about his education, employment history—or even his name."

149. Plaintiff alleges that the first statement conveyed as fact that Plaintiff had fabricated or materially misrepresented a relationship with the White House for the purpose of obtaining influence.

150. Plaintiff possesses documentation concerning his selection or appointment in connection with the Presidential Scholars Commission and alleges that his representations concerning that governmental relationship were not fabricated.

151. Plaintiff further alleges that he has consistently identified his educational history and possesses institutional records capable of establishing the material facts concerning his academic credentials.

152. Plaintiff likewise possesses records capable of establishing his identity and the relationship between his lengthy legal name and the shortened name variations he has used professionally.

153. Plaintiff alleges that the September 24 publication is especially significant because it brought together the same categories of alleged deception that had repeatedly appeared throughout the campaign: identity, name, education, professional history, and relationship with the White House.

154. The publication was also expressly directed toward Plaintiff's client and questioned why that client continued paying Plaintiff.

155. Plaintiff alleges that this demonstrates that the intended audience and objective of the communication extended beyond ordinary political debate and included an effort to cause a specific professional relationship to deteriorate or terminate.

156. Plaintiff does not allege that this effort necessarily succeeded. Plaintiff will establish any actual economic loss, contractual disruption, lost business opportunity, or other special damages through evidence.

157. Plaintiff alleges that the September 24 publication, occurring after the alleged threats from Ambassador Fani-Kayode, is relevant to determining whether the reputational attacks and intimidation were isolated events or components of a continuing campaign against Plaintiff.

158. Plaintiff does not allege that chronology alone proves an agreement between DCI and Fani-Kayode.

159. Plaintiff alleges that the chronology, recurring subject matter, documented relationship between DCI and the Republic of Nigeria, official position of Fani-Kayode, use of unusually specific biographical information, common target, and common political interest collectively justify discovery concerning communications and coordination among the relevant actors.

## XII. CHRONOLOGY AND CIRCUMSTANTIAL EVIDENCE OF ALLEGED COORDINATION

160. Plaintiff alleges the following sequence as material circumstantial evidence:

a. Plaintiff engaged in sustained Washington-based advocacy concerning FBI, DEA, and other federal law-enforcement records relating to President Tinubu;

b. DCI was simultaneously serving as a registered United States representative of the Republic of Nigeria through Aster Legal and utilizing Secure Nigeria and @SecureNigeriaHQ as communications media in connection with that representation;

c. On September 16, 2026, @SecureNigeriaHQ repeatedly targeted Plaintiff while referring to him as "Ikemefuna Okeke";

d. On September 20–21, 2026, Ambassador Fani-Kayode allegedly escalated attacks against Plaintiff, used similarly unusual name variations, accused Plaintiff of being a "felon and convicted criminal," and directed statements toward Plaintiff concerning airport interception, detention, kidnapping, physical consequences, or other coercive treatment;

e. On September 21, 2026, @SecureNigeriaHQ accused Plaintiff of having changed his name to "bury a checkered past" and asked "what else are you hiding?";

f. On September 24, 2026, @SecureNigeriaHQ directly addressed Plaintiff's client, questioned why the client continued paying Plaintiff, and accused Plaintiff of falsely presenting himself as a White House adviser and being unable to answer basic questions concerning his education, employment history, or name.

161. Plaintiff alleges that this chronology reflects an escalating and continuing focus upon Plaintiff personally during a period in which Plaintiff was actively advocating against interests of President Tinubu before the United States Government.

162. Plaintiff does not ask the Court to infer an actionable agreement merely because multiple actors criticized Plaintiff during the same period.

163. Plaintiff instead alleges that the chronology should be considered together with the documented principal-agent or professional relationships, recurring use of unusually specific personal information, common political interests, alleged threats, particular statements, and any communications revealed through discovery.

164. Plaintiff alleges, upon information and belief where appropriate, that discovery will establish whether these events were wholly independent or resulted in whole or in part from common information sources, instructions, coordination, authorization, ratification, or agreement.

165. Plaintiff therefore seeks relevant communications and records sufficient to determine the origin, dissemination, approval, intended audience, and purpose of the challenged statements and alleged threats.

## XIII. JURISDICTION AND VENUE

166. This Court has subject-matter jurisdiction over claims against Defendant DCI Group AZ, L.L.C. and the individual foreign Defendant or Defendants to the extent provided by 28 U.S.C. § 1332 and other applicable federal jurisdictional provisions, subject to proof of the citizenship of the parties and complete diversity.

167. Plaintiff alleges that the amount in controversy exceeds $75,000, exclusive of interest and costs.

168. Defendant DCI maintains substantial operations within the District of Columbia, including an office at 2000 K Street NW, Washington, D.C., and performs government-relations and public-affairs activities within this District.

169. Plaintiff alleges that DCI's challenged activities were undertaken, at least in substantial part, in connection with its representation of the Republic of Nigeria before audiences and institutions within the United States, including within Washington, D.C.

170. This Court's jurisdiction over the Federal Republic of Nigeria, if any, is governed by 28 U.S.C. §§ 1330, 1602–1611, commonly known as the Foreign Sovereign Immunities Act ("FSIA").

171. Plaintiff recognizes that Nigeria is presumptively immune from the jurisdiction of United States courts unless an applicable statutory exception is established.

172. Plaintiff further recognizes that the noncommercial-tort exception contained in 28 U.S.C. § 1605(a)(5) expressly excludes claims arising out of libel, slander, misrepresentation, deceit, and interference with contract rights.

173. Plaintiff therefore does not rely upon § 1605(a)(5) as a jurisdictional basis for imposing defamation liability upon Nigeria.

174. Plaintiff pleads the acts allegedly undertaken by Nigeria, its officials, agents, representatives, or contractors so that the Court may determine whether any claim falls within an applicable FSIA exception and whether the conduct underlying that claim is legally attributable to the foreign sovereign.

175. President Bola Ahmed Tinubu and Ambassador Femi Fani-Kayode are natural persons. Plaintiff recognizes that questions concerning immunity of individual foreign officials are analytically distinct from the statutory immunity of the foreign state itself and may implicate federal common law, diplomatic law, status-based immunity, conduct-based immunity, or other doctrines.

176. Plaintiff respectfully submits those questions to this Court and requests determination of any claimed immunity according to each Defendant's status, capacity, conduct, and the governing law.

177. Plaintiff alleges personal jurisdiction over DCI because DCI maintains substantial operations within the District, performs activities here, and allegedly participated from or through its District-based operations in conduct purposefully directed toward Plaintiff's Washington-based professional activities and relationships.

178. Plaintiff alleges personal jurisdiction over the remaining non-sovereign Defendants to the maximum extent permitted by the District of Columbia long-arm statute, D.C. Code § 13-423, and the Due Process Clause. Plaintiff alleges that the challenged conduct was intentionally and purposefully directed toward Plaintiff's Washington, D.C.-based governmental advocacy and professional relationships, including his communications and activities involving Congress, Executive Branch officials, federal agencies, clients, and

other Washington-based professional contacts. Plaintiff further alleges that the challenged conduct was intended to impair Plaintiff's credibility and effectiveness specifically within those District-centered professional and governmental relationships. Plaintiff respectfully submits the sufficiency of those contacts, and any jurisdictional facts developed through appropriate discovery, to the Court.

179. Venue is proper in this District under 28 U.S.C. § 1391 to the extent applicable because a substantial portion of the conduct, intended effects, professional relationships, governmental advocacy, and alleged injuries giving rise to this action occurred in or were purposefully directed toward the District of Columbia.

180. Venue concerning the Federal Republic of Nigeria is additionally governed by 28 U.S.C. § 1391(f), subject to the Court's determination of sovereign immunity and jurisdiction.

COUNT I
DEFAMATION / LIBEL
Against Defendant Ambassador Femi Fani-Kayode

181. Plaintiff incorporates by reference the preceding paragraphs to the extent applicable to this Count.

182. Ambassador Fani-Kayode published to third parties a written statement identifying Plaintiff as a "felon and convicted criminal."

183. The statement concerned Plaintiff and was reasonably understood by readers as asserting an objectively verifiable fact concerning Plaintiff's criminal history.

184. Plaintiff alleges that Fani-Kayode's characterization of Plaintiff as a "felon" was materially false.

185. Plaintiff alleges that he is not a felon, has never been convicted of a felony, and has never served a day of incarceration as a result of any criminal conviction. Plaintiff alleges that Fani-Kayode's characterization of Plaintiff as a "felon" falsely and materially misrepresented Plaintiff's criminal history.

186. The materially false characterization of Plaintiff as a "felon" was defamatory because it tended to expose Plaintiff to contempt, distrust, ridicule, professional disqualification, and reputational injury and was particularly harmful to a professional whose work requires credibility with government officials, clients, policymakers, and other professional contacts.

187. Plaintiff alleges that Fani-Kayode published the accusation with the degree of fault required by applicable law.

188. To the extent Plaintiff is determined to be a public figure or limited-purpose public figure concerning the relevant controversy, Plaintiff alleges that Fani-Kayode acted with actual malice because he knew the accusation was false or subjectively entertained serious doubts concerning its truth and published it nevertheless.

189. Plaintiff alleges that the publication caused reputational injury, professional injury, emotional distress, and other damages to be established through evidence.

190. Plaintiff seeks compensatory, presumed, special, and punitive damages to the extent applicable law authorizes them and the evidence establishes them.

COUNT II
DEFAMATION AND DEFAMATION BY IMPLICATION

Against Defendant DCI Group AZ, L.L.C.

191. Plaintiff incorporates by reference the preceding paragraphs to the extent applicable to this Count.

192. Through @SecureNigeriaHQ, a communications account identified in DCI's federal foreign-agent disclosures in connection with its representation of the Republic of Nigeria through Aster Legal, DCI published or caused to be published statements concerning Plaintiff.

193. On September 21, 2026, @SecureNigeriaHQ addressed Plaintiff as "Ikemefuna Okeke" and asserted, in substance, that Plaintiff had "changed [his] name to bury a checkered past," followed by the question, "what else are you hiding?"

194. Plaintiff does not contend that use of "Ikemefuna Okeke," standing alone, is defamatory.

195. Plaintiff alleges that the actionable meaning arises from the assertion that Plaintiff changed his identity or name for the deceptive purpose of concealing a discreditable past.

196. Plaintiff alleges that this factual assertion or implication is materially false.

197. Plaintiff's use of shortened or different portions of his name arises from his lengthy legal name and was not undertaken to fabricate an identity or conceal a "checkered past."

198. On September 24, 2026, @SecureNigeriaHQ published another communication concerning Plaintiff that directly addressed Plaintiff's client and asked, "Why are you still paying this guy?"

199. The publication then accused Plaintiff, among other things, of "Falsely presenting himself as a White House adviser to gain influence."

200. Plaintiff alleges that this statement conveyed that Plaintiff knowingly fabricated or materially misrepresented a White House relationship for the deceptive purpose of obtaining professional or political influence.

201. Plaintiff alleges that the factual implication is materially false.

202. Plaintiff possesses documentation concerning his appointment or selection in connection with the Presidential Scholars Commission and alleges that he did not fabricate the governmental relationship underlying his public representations.

203. The September 24 publication further asserted that Plaintiff was "Unable to answer basic questions about his education, employment history—or even his name."

204. In the context of the preceding publications accusing Plaintiff of concealing his identity and falsely presenting a White House relationship, Plaintiff alleges that the statement reinforced the factual implication that Plaintiff's identity, education, and professional history were fabricated or deceptive.

205. Plaintiff alleges that DCI published the challenged statements with the degree of fault required by applicable law.

206. To the extent an actual-malice standard applies, Plaintiff alleges that DCI published the challenged statements knowing material accusations were false or while subjectively entertaining serious doubts concerning their truth.

207. Plaintiff seeks discovery concerning DCI's research, source materials, internal communications, editorial process, governmental communications, and information concerning Plaintiff available to DCI before publication.

208. Plaintiff alleges that the publications injured his professional reputation and were particularly calculated to interfere with his credibility among clients, governmental officials, policymakers, journalists, and other professional contacts.

209. Plaintiff seeks compensatory, presumed, special, and punitive damages to the extent authorized by law and established through evidence.

COUNT III
CIVIL ASSAULT

Against Defendant Ambassador Femi Fani-Kayode

210. Plaintiff incorporates by reference the preceding paragraphs to the extent applicable to this Count.

211. Plaintiff alleges that Fani-Kayode intentionally directed statements toward Plaintiff threatening or communicating the prospect of forcible interception, detention, kidnapping, physical harm, imprisonment, or other unwanted physical restraint in connection with Plaintiff's international travel.

212. Plaintiff alleges that the statements were made in circumstances intended to cause Plaintiff to apprehend that physical restraint or harmful contact could be carried out against him.

213. Plaintiff further alleges that Fani-Kayode's official diplomatic status materially increased the credibility and coercive force of statements concerning what could happen to Plaintiff while traveling internationally.

A. Defendant Fani-Kayode acted intentionally, maliciously, and with reckless disregard for the foreseeable and profoundly coercive effect of threatening an American citizen of Nigerian descent with forcible airport interception, prolonged detention, kidnapping, physical harm, or comparable extrajudicial treatment. Plaintiff alleges that Defendant knew or reasonably should have known that such a threat, issued by an incumbent diplomatic representative of a foreign sovereign and directed personally at Plaintiff, would place Plaintiff in serious and objectively reasonable fear for his life, physical liberty, and safety.

214. Plaintiff understood the statements as a serious warning concerning his physical liberty and safety and alleges that they caused actual apprehension and resulted in reasonable security precautions and changes in conduct.

A. The coercive and threatening character of Defendant Fani-Kayode's conduct was magnified by the governmental authority and power his official position represented. Plaintiff alleges that Defendant deliberately invoked that authority by threatening personally to meet Plaintiff "at the airport," provide him a "befitting welcome," and subject him to a "very long holiday," while warning that Plaintiff's time would "soon be over" and declaring "Can't wait!" These statements were made against a documented historical record, spanning approximately four decades, in which United States Government and international reporting has identified grave abuses involving Nigerian governmental and security authorities, including arbitrary and unlawful detention, prolonged and incommunicado detention, torture, extrajudicial or unlawful killings, and, during multiple reporting periods, forced or enforced disappearances. Plaintiff alleges that Defendant's official position, the specific language he chose, and this documented historical context transformed the threatened airport encounter from ordinary political rhetoric into a credible and coercive threat to Plaintiff's physical liberty and safety.

215. Plaintiff alleges that the statements and surrounding circumstances satisfy the requirements for civil assault to the extent the threatened contact was sufficiently imminent under applicable District of Columbia law. Plaintiff recognizes that the threatened airport encounter was contingent upon future travel and respectfully submits to the Court whether, considering the complete context and circumstances alleged herein, the imminence requirement is satisfied.

A. Plaintiff further alleges that the credibility and coercive character of Defendant Fani-Kayode's threats were reinforced by his subsequent express statement that he intended "to report [Plaintiff] to the relevant security agencies in our country" for Plaintiff's alleged violations of Nigerian law. Defendant subsequently escalated his invocation of Nigerian governmental authority by publicly stating that he would seek Plaintiff's extradition from the United States to Nigeria to answer for alleged violations of Nigerian cybercrime and criminal-defamation laws. Plaintiff alleges that these subsequent statements demonstrate that Defendant was expressly contemplating and invoking Nigerian governmental mechanisms capable of affecting Plaintiff's physical liberty and materially reinforced Plaintiff's understanding of Defendant's earlier promise to meet him "at the airport," provide him a "befitting welcome," and subject him to a "very long holiday" as a credible and coercive threat rather than ordinary political rhetoric.

216. In the alternative, should the Court determine that the alleged threats were insufficiently imminent to constitute civil assault, Plaintiff pleads the same conduct as part of his intentional-infliction-of-emotional-distress claim and as evidence concerning the alleged campaign of coercive intimidation.

217. Plaintiff seeks all compensatory and punitive damages permitted by law.

## COUNT IV
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Against Defendant Ambassador Femi Fani-Kayode

218. Plaintiff incorporates by reference the preceding paragraphs to the extent applicable to this Count.

219. Plaintiff alleges that Fani-Kayode intentionally or recklessly engaged in extreme and outrageous conduct by directing threats of forcible interception, detention, kidnapping, physical harm, imprisonment, or comparable coercive treatment toward Plaintiff while Plaintiff was engaged in lawful advocacy within the United States.

220. Plaintiff alleges that the conduct must be evaluated in context, including Fani-Kayode's position as an appointed diplomatic representative of the Nigerian government, Plaintiff's international professional activities, and Fani-Kayode's alleged knowledge that Plaintiff was engaged in advocacy adverse to President Tinubu.

221. Plaintiff alleges that Fani-Kayode intended to cause Plaintiff serious fear and emotional distress or acted in reckless disregard of the near certainty that such statements would cause such distress.

222. Plaintiff's characterization of the communication as a threat of kidnapping, prolonged involuntary detention, and physical harm is based upon Fani-Kayode's actual words, including that Plaintiff's time would "soon be over," that Fani-Kayode would "meet [Plaintiff] at the airport," provide a "befitting welcome," and that Plaintiff would experience a "very long holiday," followed by "Can't wait!"

223. Plaintiff alleges that he reasonably took the threats seriously and suffered severe emotional distress, anxiety concerning international travel and personal safety, professional disruption, and the need to undertake additional security precautions.

224. Plaintiff alleges that the threats were not isolated insults, rhetorical hyperbole, or ordinary political disagreement but communicated potential governmental or quasi-governmental consequences directed toward a specifically identified individual, including alleged forcible seizure or kidnapping, prolonged involuntary detention, and physical harm. Plaintiff alleges that the extreme and outrageous character of the conduct must be evaluated in its complete context, including Fani-Kayode's official diplomatic position, the personally directed nature of the communication, the promised airport interception, the reference to a "very long holiday," the statement that Plaintiff's time would "soon be over," the declaration "Can't wait!", and Plaintiff's ongoing advocacy concerning President Tinubu.

225. Plaintiff seeks compensatory and punitive damages to the extent authorized by law.

COUNT V
CIVIL CONSPIRACY

Against DCI Group AZ, L.L.C., Ambassador Femi Fani-Kayode, President Bola Ahmed Tinubu, the Federal Republic of Nigeria, and Any Other Defendant Shown by the Evidence to Have Participated in the Agreement, Subject to Applicable Immunity and Jurisdictional Limitations

226. Plaintiff incorporates by reference the preceding paragraphs to the extent applicable to this Count.

227. Plaintiff alleges, upon information and belief where appropriate, that two or more participants, including DCI Group AZ, L.L.C., Ambassador Femi Fani-Kayode, and, to

the extent established through discovery and permitted by applicable immunity and jurisdictional law, President Bola Ahmed Tinubu and/or the Federal Republic of Nigeria, agreed expressly or tacitly to undertake actionable conduct directed toward discrediting, intimidating, threatening, or otherwise interfering with Plaintiff in connection with his advocacy concerning President Tinubu. Plaintiff alleges liability against President Tinubu and Nigeria only to the extent admissible evidence establishes their participation, authorization, direction, ratification, agency, or other legally cognizable responsibility for the actionable agreement or acts undertaken in furtherance thereof.

228. Plaintiff does not contend that civil conspiracy constitutes an independent tort divorced from an underlying actionable wrong.

229. Plaintiff alleges underlying wrongful acts including actionable defamation and, where established, assault, intentional infliction of emotional distress, or other cognizable tortious conduct.

230. Plaintiff alleges that acts undertaken in furtherance of the alleged agreement included the collection and dissemination of information concerning Plaintiff; publication or republication of allegedly false factual accusations concerning his identity, governmental relationships, and criminal history; and alleged threats directed toward Plaintiff's physical liberty or safety.

231. Plaintiff alleges that the chronology, recurring use of unusually specific biographical information, documented relationship between DCI and the Republic of Nigeria, official position of Fani-Kayode, common target, common governmental interest, and sequence of publications and alleged threats constitute circumstantial evidence relevant to whether an agreement existed.

232. Plaintiff does not allege that those circumstances independently establish an agreement.

233. Plaintiff seeks discovery concerning communications, instructions, information exchanges, source materials, approvals, reporting, authorization, ratification, and other evidence capable of establishing whether an express or tacit agreement existed, including evidence sufficient to determine whether President Tinubu, the Federal Republic of Nigeria, their officials or representatives, DCI, Aster Legal, Secure Nigeria personnel, Ambassador Fani-Kayode, or any other participant authorized, directed, approved, supplied information for, participated in, or ratified any actionable component of the alleged agreement.

234. Plaintiff alleges that each participant in any proven agreement committed, authorized, assisted, or ratified one or more acts in furtherance of the common objective.

235. Plaintiff alleges that the acts undertaken pursuant to any such agreement caused reputational, professional, emotional, and economic injury.

236. Plaintiff seeks damages against those Defendants whom the evidence establishes actually participated in an actionable conspiracy, subject to all applicable immunity and other defenses.

## XIV. CLAIMS AND ATTRIBUTION CONCERNING PRESIDENT TINUBU AND THE FEDERAL REPUBLIC OF NIGERIA

237. Plaintiff alleges that President Tinubu and the Federal Republic of Nigeria are connected to the events described herein as alleged principals, beneficiaries, governmental actors, sources of authority, or participants to the extent established through admissible evidence.

238. Plaintiff recognizes that neither political benefit nor governmental association alone establishes civil liability.

239. Plaintiff therefore seeks to impose liability upon President Tinubu only for actionable conduct that admissible evidence establishes he personally authorized, directed, participated in, approved, ratified, or otherwise bears legal responsibility for under governing law, including any proven participation in or authorization of an actionable agreement to defame, intimidate, threaten, or otherwise unlawfully interfere with Plaintiff's advocacy. Plaintiff does not allege that President Tinubu's political benefit from criticism of Plaintiff, standing alone, establishes liability.

240. Plaintiff similarly seeks to impose liability upon the Federal Republic of Nigeria only for actionable conduct legally attributable to the sovereign and falling within an applicable exception to sovereign immunity, including, to the extent permitted by law, actionable conduct undertaken by officials, employees, agents, representatives, or contractors acting within the scope of their authority or agency and any proven participation in, authorization of, direction of, or ratification of an actionable agreement alleged herein. Plaintiff recognizes that attribution of conduct to Nigeria does not itself establish an exception to sovereign immunity; that both attribution and an applicable statutory exception must independently be established; and that any territorial, subject-matter, or other requirements of the applicable FSIA exception must also be satisfied. Plaintiff respectfully submits those jurisdictional determinations to the Court based upon the evidentiary record developed concerning the location, nature, authorization, and implementation of the alleged conduct.

241. Plaintiff acknowledges that certain tort claims, including claims arising from libel or slander, are expressly excluded from the FSIA noncommercial-tort exception and does not seek to circumvent those statutory limitations by relabeling such claims.

242. Plaintiff nevertheless alleges that the communications, relationships, agency arrangements, diplomatic conduct, and other activities of Nigeria and its representatives

are relevant to determining attribution, authorization, ratification, motive, intent, and the existence or absence of any actionable agreement.

243. Plaintiff respectfully requests that questions concerning the immunity of President Tinubu and Nigeria be adjudicated by the Court under the governing law based upon the actual conduct, capacity, attribution, and evidentiary record applicable to each claim.

244. To the extent this Court determines that Defendant President Bola Ahmed Tinubu or Defendant the Federal Republic of Nigeria is entitled to sovereign, status-based, or conduct-based immunity from any specific count asserted herein, Plaintiff respectfully requests that such determination be restricted strictly to the immune Defendant and the particular claim or claims barred by that immunity. Any immunity afforded to President Tinubu or the Federal Republic of Nigeria should not, solely by virtue of that immunity, extend to or extinguish independently viable claims against other Defendants, including Defendant DCI Group AZ, L.L.C. and Defendant Femi Fani-Kayode in his individual capacity, subject to any separate immunity, jurisdictional, or other defenses available to those Defendants and to the extent liability is otherwise established under applicable law.

## XV. DAMAGES AND INJURY

245. As a direct and proximate result of the actionable conduct alleged herein, Plaintiff has suffered and continues to suffer reputational, professional, emotional, and economic injury.

246. Plaintiff's professional activities depend substantially upon his reputation for honesty, credibility, reliability, and integrity among Members of Congress, congressional staff, Executive Branch officials, federal departments and agencies, clients, prospective clients, journalists, policymakers, foreign representatives, and other participants in the Washington governmental and international-policy community.

247. The challenged publications attacked those professional attributes directly by portraying Plaintiff as dishonest concerning his identity, governmental relationships, educational history, professional background, and criminal history.

248. Plaintiff alleges that accusations that he fabricated a White House relationship, concealed his identity by changing his name, could not account for his educational and professional history, or was falsely characterized as a "felon" were reasonably capable of causing third parties to question whether Plaintiff could be trusted professionally.

249. Plaintiff further alleges that certain challenged communications were expressly directed toward persons with whom Plaintiff maintained professional relationships.

250. In particular, the September 24, 2026 Secure Nigeria publication expressly addressed Plaintiff's client and asked why that client was "still paying this guy" before presenting accusations concerning Plaintiff's honesty and professional legitimacy.

251. Plaintiff alleges that this communication demonstrates that at least part of the challenged conduct was intended to reach and influence an existing professional relationship.

252. Plaintiff will establish through discovery and admissible evidence the existence and amount of any lost revenue, lost professional opportunity, contractual disruption, prospective-business injury, reputational damage, or other economic loss caused by actionable conduct.

253. Plaintiff further alleges that Ambassador Fani-Kayode's alleged threats caused injury separate and apart from reputational damage.

254. Plaintiff alleges that statements concerning interception, detention, kidnapping, physical harm, imprisonment, or comparable coercive treatment caused genuine concern for Plaintiff's personal safety and freedom of movement.

255. Plaintiff alleges that he was required to consider and undertake additional security precautions and to evaluate the risks associated with international travel and continued public advocacy.

256. Plaintiff alleges that the combination of threats to his reputation and alleged threats to his physical liberty caused substantial emotional distress and professional disruption.

257. Plaintiff seeks general and compensatory damages for injuries established through admissible evidence.

258. Plaintiff seeks special and economic damages to the extent such damages are established with the specificity required by applicable law.

259. Plaintiff seeks presumed damages only to the extent permitted under the governing defamation law and constitutional standard applicable to the particular Defendant and publication.

260. Plaintiff seeks punitive damages against DCI and Fani-Kayode to the extent authorized by law and supported by evidence demonstrating the requisite malicious, willful, wanton, reckless, or otherwise culpable conduct.

261. Plaintiff does not seek punitive damages against the Federal Republic of Nigeria where prohibited by 28 U.S.C. § 1606.

262. Plaintiff seeks no category of damages against any Defendant that is prohibited by an applicable immunity, statute, constitutional limitation, or other governing law.

## XVI. DISCOVERY AND EVIDENTIARY MATTERS

263. Material evidence concerning the alleged coordination, authorization, source of information, and intent underlying the conduct described herein is presently within the possession, custody, or control of Defendants and relevant third parties.

264. Plaintiff intends to seek discovery proportionate to the claims and defenses concerning communications, documents, electronically stored information, source materials, instructions, approvals, and other evidence relating to Plaintiff and the challenged conduct.

265. Such discovery may include communications among DCI, persons responsible for Secure Nigeria and @SecureNigeriaHQ, Aster Legal, relevant Nigerian governmental officials, representatives of President Tinubu, Ambassador Fani-Kayode, and other persons shown through discovery to have participated in relevant communications concerning Plaintiff.

266. Relevant subjects include Plaintiff's identity and name; educational history; employment and professional history; Presidential Scholars Commission appointment or selection; White House relationships; congressional relationships; clients; advocacy concerning President Tinubu; FBI and DEA records; governmental meetings; professional schedule; international travel; and communications strategies concerning Plaintiff.

267. Plaintiff further intends to seek information identifying the persons who researched, drafted, reviewed, approved, scheduled, published, or supplied information for the challenged @SecureNigeriaHQ publications.

268. Plaintiff intends to seek information concerning the source and factual basis for the September 21 assertion that Plaintiff changed his name to "bury a checkered past."

269. Plaintiff intends to seek information concerning the source and factual basis for the September 24 assertion that Plaintiff falsely presented himself as a White House adviser to obtain influence.

270. Plaintiff further intends to seek information concerning the source of Ambassador Fani-Kayode's assertion that Plaintiff was a "felon and convicted criminal."

271. Plaintiff intends to seek relevant communications sufficient to determine whether Fani-Kayode obtained information concerning Plaintiff's identity, governmental contacts, anticipated meetings, professional schedule, or travel from any Defendant or other participant in the alleged campaign.

272. Plaintiff further intends to seek evidence concerning whether any Nigerian governmental official or representative authorized, encouraged, received advance notice of, approved, ratified, or subsequently adopted any actionable statement or alleged threat.

273. Plaintiff recognizes that discovery involving a foreign sovereign, diplomatic communications, governmental materials, or potentially privileged information may implicate limitations not applicable to ordinary civil discovery.

274. Plaintiff seeks only discovery permitted by the Federal Rules of Civil Procedure and applicable federal law and reserves the right to request appropriate judicial procedures for resolving claims of privilege, immunity, confidentiality, or other protections.

## XVII. PRESERVATION OF RELEVANT EVIDENCE

275. Plaintiff alleges that electronically stored information is likely to constitute material evidence concerning the claims and defenses in this action.

276. Relevant evidence may include emails, text messages, encrypted or messaging-platform communications, direct messages, social-media drafts and publications, internal memoranda, research materials, source documents, communications plans, reports, invoices, contractual records, governmental instructions, and communications concerning Plaintiff.

277. Plaintiff has previously taken steps to preserve publicly available evidence relevant to the alleged campaign, including publications appearing through @SecureNigeriaHQ.

278. Plaintiff respectfully requests that the parties comply with their preservation obligations under applicable law once litigation is reasonably anticipated and throughout this action.

279. Plaintiff reserves all rights concerning spoliation or loss of relevant evidence should the evidentiary record establish a legally cognizable failure to preserve material information.

## XVIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against the appropriate Defendants and grant the following relief to the extent authorized by law and supported by the evidence:

A. Enter judgment against Defendant Ambassador Femi Fani-Kayode on Plaintiff's claim for defamation upon proof of the elements of that claim;

B. Enter judgment against Defendant DCI Group AZ, L.L.C. on Plaintiff's claims for defamation and defamation by implication upon proof of the elements of those claims;

C. Enter judgment against Defendant Ambassador Femi Fani-Kayode on Plaintiff's claim for civil assault if the Court determines that the alleged threats and surrounding circumstances satisfy the requirements of that tort;

D. Enter judgment against Defendant Ambassador Femi Fani-Kayode on Plaintiff's claim for intentional infliction of emotional distress upon proof of the elements of that claim;

E. Enter judgment against those Defendants whom the evidence establishes participated in an actionable civil conspiracy, subject to all applicable immunity, jurisdictional, and other defenses;

F. Determine the existence, scope, and applicability of any sovereign, head-of-state, diplomatic, foreign-official, conduct-based, or other immunity asserted by President Bola Ahmed Tinubu, the Federal Republic of Nigeria, Ambassador Femi Fani-Kayode, or any other Defendant;

G. Award Plaintiff compensatory, special, economic, and other recoverable damages against the Federal Republic of Nigeria and President Bola Ahmed Tinubu, to the extent the Court determines that jurisdiction exists, applicable immunity does not bar recovery, and the evidence establishes legal responsibility, in an amount of $36,000,000, subject to proof at trial;

H. Award Plaintiff compensatory, special, economic, and other recoverable damages against Ambassador Femi Fani-Kayode individually in an amount of $3,000,000, subject to proof at trial, for actionable conduct legally attributable to him, including the materially false characterization of Plaintiff as a "felon," and any proven civil assault, intentional infliction of emotional distress, or other actionable threat-based conduct;

I. To the extent the evidence establishes that Ambassador Femi Fani-Kayode undertook actionable conduct within the scope of his office, employment, or agency and at least in part for the purpose of serving or advancing the interests of the Federal Republic of Nigeria, hold the Federal Republic of Nigeria responsible for such conduct only to the extent attribution and liability are permitted under the Foreign Sovereign Immunities Act and other applicable law, without permitting duplicative recovery for the same injury;

J. Award Plaintiff compensatory, special, economic, and other recoverable damages against Defendant DCI Group AZ, L.L.C. in an amount of $18,000,000, subject to proof at trial, for actionable conduct legally attributable to DCI;

K. Award punitive and exemplary damages against Ambassador Femi Fani-Kayode and DCI Group AZ, L.L.C., separately and in amounts to be determined by the Court, to the extent punitive damages are authorized by applicable law and supported by the evidence;

L. Plaintiff does not seek punitive damages against the Federal Republic of Nigeria where prohibited by 28 U.S.C. § 1606;

M. To the extent two or more Defendants are adjudged legally responsible for the same indivisible injury, impose joint and several liability only to the extent authorized by the substantive law governing the applicable claim, without permitting Plaintiff duplicative recovery for the same injury;

N. Award Plaintiff pre-judgment and post-judgment interest to the extent authorized by law;

O. Award Plaintiff recoverable costs and such fees, if any, as are authorized by applicable law;

P. Grant appropriate declaratory relief concerning the rights and liabilities of the parties to the extent such relief is legally available and supported by the record; and

Q. Grant such other and further relief as the Court deems just and proper.

XIX. JURY DEMAND

280. Plaintiff demands trial by jury on all claims and issues for which a right to jury trial exists.

Respectfully submitted,

Dr. Karl Von Batten
Plaintiff Pro Se
9/28/2026
1300 Pennsylvania Avenue NW, Suite 701
Washington, DC 20004
202-341-2014
karl.vonbatten@montagueyork.com

Public Law 94-583
94th Congress

## An Act

To define the jurisdiction of United States courts in suits against foreign states, the circumstances in which foreign states are immune from suit and in which execution may not be levied on their property, and for other purposes.

Oct. 21, 1976
[H.R. 11315]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That this Act may be cited as the "Foreign Sovereign Immunities Act of 1976".

Foreign Sovereign Immunities Act of 1976. 28 USC 1 note.

SEC. 2. (a) That chapter 85 of title 28, United States Code, is amended by inserting immediately before section 1331 the following new section:

**"§ 1330. Actions against foreign states**

28 USC 1330.

Jurisdiction.

"(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

*Post*, p. 2892.

"(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

*Post*, p. 2894.

"(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.".

(b) By inserting in the chapter analysis of that chapter before—

"1331. Federal question; amount in controversy; costs."

the following new item:

"1330. Action against foreign states.".

SEC. 3. That section 1332 of title 28, United States Code, is amended by striking subsections (a) (2) and (3) and substituting in their place the following:

"(2) citizens of a State and citizens or subjects of a foreign state;

"(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

"(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.".

SEC. 4. (a) That title 28, United States Code, is amended by inserting after chapter 95 the following new chapter:

## "Chapter 97.—JURISDICTIONAL IMMUNITIES OF FOREIGN STATES

"Sec.

"1602. Findings and declaration of purpose.
"1603. Definitions.
"1604. Immunity of a foreign state from jurisdiction.
"1605. General exceptions to the jurisdictional immunity of a foreign state.
"1606. Extent of liability.

"1607. Counterclaims.
"1608. Service; time to answer default.
"1609. Immunity from attachment and execution of property of a foreign state.
"1610. Exceptions to the immunity from attachment or execution.
"1611. Certain types of property immune from execution.

28 USC 1602.

**"§ 1602. Findings and declaration of purpose**

"The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

28 USC 1603.

**"§ 1603. Definitions**

"For purposes of this chapter—

"(a) A 'foreign state', except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

"(b) An 'agency or instrumentality of a foreign state' means any entity—

"(1) which is a separate legal person, corporate or otherwise, and

"(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

"(3) which is neither a citizen of a State of the United States as defined in section 1332 (c) and (d) of this title, nor created under the laws of any third country.

"(c) The 'United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

"(d) A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

"(e) A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States.

28 USC 1604.

**"§ 1604. Immunity of a foreign state from jurisdiction**

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

28 USC 1605.

**"§ 1605. General exceptions to the jurisdictional immunity of a foreign state**

"(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

"(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of

the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

"(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

"(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

"(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue; or

"(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—

"(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

"(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

"(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: *Provided*, That— Suit in admiralty.

Notice.

"(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; but such notice shall not be deemed to have been delivered, nor may it thereafter be delivered, if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit—unless the party was unaware that the vessel or cargo of a foreign state was involved, in which event the service of process of arrest shall be deemed to constitute valid delivery of such notice; and

"(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in subsection (b)(1) of this section or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

Whenever notice is delivered under subsection (b)(1) of this section, the maritime lien shall thereafter be deemed to be an in personam

claim against the foreign state which at that time owns the vessel or cargo involved: *Provided*, That a court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose, such value to be determined as of the time notice is served under subsection (b)(1) of this section.

28 USC 1606.

**"§ 1606. Extent of liability**

"As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

28 USC 1607.

**"§ 1607. Counterclaims**

"In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim—

"(a) for which a foreign state would not be entitled to immunity under section 1605 of this chapter had such claim been brought in a separate action against the foreign state; or

"(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or

"(c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

28 USC 1608.

**"§ 1608. Service; time to answer; default**

"(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:

"(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

"(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

"(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

"(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of

Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

As used in this subsection, a 'notice of suit' shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation. "Notice of suit."

"(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

"(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

"(2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

"(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

"(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

"(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

"(C) as directed by order of the court consistent with the law of the place where service is to be made.

"(c) Service shall be deemed to have been made—

"(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and

"(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

"(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

"(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

**"§ 1609. Immunity from attachment and execution of property of a foreign state** 28 USC 1609.

"Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property

in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

28 USC 1610.

**"§ 1610. Exceptions to the immunity from attachment or execution**

"(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

"(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

"(2) the property is or was used for the commercial activity upon which the claim is based, or

"(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

"(4) the execution relates to a judgment establishing rights in property—

"(A) which is acquired by succession or gift, or

"(B) which is immovable and situated in the United States: *Provided*, That such property is not used for purposes of maintaining a diplomatic or consular mission or the residence of the Chief of such mission, or

"(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment.

"(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

"(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

"(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a) (2), (3), or (5), or 1605(b) of this chapter, regardless of whether the property is or was used for the activity upon which the claim is based.

"(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

"(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

"(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

"(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

**"§ 1611. Certain types of property immune from execution** 28 USC 1611.

"(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States. 22 USC 288 note.

"(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—

"(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or

"(2) the property is, or is intended to be, used in connection with a military activity and

"(A) is of a military character, or

"(B) is under the control of a military authority or defense agency."

(b) That the analysis of "PART IV.—JURISDICTION AND VENUE" of title 28, United States Code, is amended by inserting after—

"95. Customs Court.",

the following new item:

"97. Jurisdictional Immunities of Foreign States.".

SEC. 5. That section 1391 of title 28, United States Code, is amended by adding at the end thereof the following new subsection: Venue.

"(f) A civil action against a foreign state as defined in section 1603(a) of this title may be brought—

"(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;

"(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;

"(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or

"(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.".

Actions removable.

SEC. 6. That section 1441 of title 28, United States Code, is amended by adding at the end thereof the following new subsection:

"(d) Any civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending. Upon removal the action shall be tried by the court without jury. Where removal is based upon this subsection, the time limitations of section 1446(b) of this chapter may be enlarged at any time for cause shown.".

28 USC 1446.

28 USC 1602 note.

SEC. 7. If any provision of this Act or the application thereof to any foreign state is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable.

Effective date. 28 USC 1602 note.

SEC. 8. This Act shall take effect ninety days after the date of its enactment.

Approved October 21, 1976.

---

LEGISLATIVE HISTORY:

HOUSE REPORT No. 94-1487 (Comm. on the Judiciary).
SENATE REPORT No. 94-1310 accompanying S. 3553 (Comm. on the Judiciary).
CONGRESSIONAL RECORD, Vol. 122 (1976):
Sept. 29, considered and passed House.
Oct. 1, considered and passed Senate.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 12, No. 43:
Oct. 22, Presidential statement.